**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
PAMELA ROETTINGER,

                     Plaintiff,

                -against-

CAROLYN W. COLVIN, Commissioner of the Social
Security Administration,

                    Defendant.
---------------------------------------------------------X

                                   **MEMORANDUM OF**
                                   **DECISION & ORDER**
                                   14-CV-1135 (ADS)

**APPEARANCES:**

**Sullivan & Kehoe, LLP**
*Attorneys for the Plaintiff*
44 Main Street
Kings Park, NY 11754
       By: Michael Brangan, Esq., Of Counsel

**United States Attorney's Office, Eastern District of New York**
*Attorneys for the Defendant*
610 Federal Plaza, 5th Floor
Central Islip, NY 11722-4454
       By: Candace Scott Appleton, Assistant U.S. Attorney

**SPATT, District Judge.**

       On September 18, 2014, the Plaintiff Pamela Roettinger (the "Plaintiff") commenced this

action pursuant to the Social Security Act, 42 U.S.C. §405(g) (the "Act"), seeking review of a

determination by the Commissioner of Social Security (the "Defendant") to deny the Plaintiff's

application for supplemental social security income ("SSI").

       Presently before the Court are the parties' motions pursuant to Federal Rule of Civil

Procedure ("Fed. R. Civ. P.") 12(c) for judgement on the pleadings. For the reasons set forth

below, the Court denies the motion by the Plaintiff and grants the cross motion by the Defendant.

# I. BACKGROUND

## A. The Plaintiff's Background

The Plaintiff was born on July 8, 1968 and is currently forty-seven years old.  (R. 3.)  On June 20, 2011, the Plaintiff submitted an application to the Social Security Administration ("SSA") for SSI.  (R. 112.)

In her application, she alleges that she has been disabled since April 2, 2008.  (Id.) However, pursuant to SSA regulations, a claimant whose alleged disability preceded her application to the SSA for benefits, can only recover benefits beginning in the month following the month that the claimant files an application with the SSA.  See 20 C.F.R. § 416.335 ("If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month."); see also Frye ex rel. A.O. v. Astrue, 485 F. App'x 484, 486 n. 1 (2d Cir. 2012) (summary order) ("The earliest month for which SSI benefits could be paid would be the month following the month Frye filed A.O.'s application."); Roman v. Colvin, No. 13-CV-7284 KBF, 2015 WL 4643136, at *1 n. 2 (S.D.N.Y. Aug. 4, 2015) ("Payment of Title XVI benefits, however, cannot precede the month following the month of application.").

Accordingly, the earliest month for which the Plaintiff could be paid SSI is July 2011, the month following June 20, 2011, the date on which the Plaintiff filed her application to the SSA for benefits.

In her application to the SSA, the Plaintiff stated that she suffers from "deteriorating discs, diabetes, bipolar disorder, anemia, heart problems, anxiety, asthma, migraines, strabismus, hypertension, and mitral valve prolapse."  (R. 135).

The Plaintiff has a history of issues relating to substance abuse. From 1993 to 2011, the Plaintiff has been incarcerated on four occasions for driving the under the influence of alcohol or drugs. (R. 38–39.) Most recently, she was incarcerated from January 7, 2010 to March 18, 2011 for driving while intoxicated. (R. 38.)

Following the onset of her alleged disability in 2008, the Plaintiff has not been employed. (R. 38.) Prior to 2008, she worked: (i) as a cashier in "retail sales" in 1996 and again from 2006 to 2007; (ii) a factory worker stuffing envelopes in 2002; (iii) a factory worker in a warehouse for brief periods in 1998, 2006, and 2008; (iv) and as a house cleaner for a cleaning services company from 1996 to 1997 and again in 2003 to 2004. (R. 136.)

The highest level of education she has attained is the tenth grade of high school. (Id.)

## B. The Medical Evidence

On August 2, 2009, the Plaintiff was admitted to Brookhaven Memorial Hospital Medical Center ("Brookhaven") for a CAT Scan of her spine. (R. 202.) It is not clear from the medical record what injury, if any, prompted her to go to the hospital. The "final report" stated that "[t]here is no fracture or subluxation. There is no prevertebral soft tissue swelling. Straightening of the cervical spine is likely due to soft tissue spasm." (Id.)

On April 5, 2011, the Plaintiff was treated at Seafield Services, Inc. ("Seafield") for mental health treatment after being released from incarceration as a result of her 2011 conviction for driving while intoxicated. (R. 237.). She reported to an unidentified staff member of Seafield that she was suffering from anxiety and depression, high blood pressure, back pain, migraines, asthma, and nasal problems. (R. 237, 241, 243.) The staff member described her as "in need of outpatient chemical dependency services" but not "in need of acute hospital care, acute psychiatric care, or other intensive service[.]" (R. 249.)

On April 14, 2011, the Plaintiff was evaluated by a nurse at Seafield. (R. 250–56.) The nurse indicated that the Plaintiff reported having a "little bit" of difficulty sleeping and had a history of mental disorders, including depression, bipolar disorder, and anxiety. (R. 255.) However, the nurse described the Plaintiff as having a "calm" and "cooperative mood" and a "normal" affect. (Id.)

On April 19, 2011, the Plaintiff was again admitted to Brookhaven because of complaints related to abdominal pain and vomiting. (R. 204.) Dr. Susan A. O'Malley ("O'Malley"), her attending physician, ordered images to be taken of the Plaintiff's abdomen. (R. 216.) According to a medical report prepared by Dr. Leon Serchuk, the images revealed a "tiny stone in the gallbladder" and "no acute inflammation . . . within the abdomen and pelvis." (R. 217.)

The following day, on April 20, 2011, the Plaintiff was discharged from Brookhaven. (R. 208.) Dr. O'Malley "advised [the Plaintiff] to avoid fried fatty foods" but did not place any other restrictions on her. (R. 211.) According to a report filed by a Registered Nurse Alexis Carollo, at the time of discharge, the Plaintiff was able to "ambulate without assistance" and suffered from "no distress." (R. 208.)

On May 5, 2011, the Plaintiff underwent a routine physical examination at the Suffolk County Department of Health Services. (R. 220-223). The notes from the examination indicate that: (i) the Plaintiff's prescriptions for Trazodone and Lamictal were renewed; (ii) she declined a referral for physical therapy; (iii) she was referred for surgery on her gallbladder to remove the stone found during the April 19, 2011 examination; and (iv) both her spine and heart condition were within normal limits. (Id. at 220–21.)

On July 7, 2011, Christopher Zeoli ("Zeoli"), a nurse practitioner at Seafield, filled out a "Self Sufficiency Review Status Report" regarding the Plaintiff's treatment. (R. 261–62.) Zeoli

indicated that the Plaintiff had been receiving treatment at Seafield for Bipolar II disorder, post-traumatic stress disorder, and alcohol dependence.  (R. 261.)   According to the report, from April 20, 2011 to July 7, 2011, the Plaintiff attended at least 75% of her treatment sessions and had been taking her medications as prescribed.  (Id.)  However, Zeoli indicated that the Plaintiff's functioning had not improved as a result of her treatment because her "medication is in [the] process of being [adjusted]."  (Id.)  Zeoli also stated that it was "undetermined at present time" when the Plaintiff could return to "work activity."  (Id.)

On August 9, 2011, the Plaintiff underwent a physical examination at Family Medicine & Pediatrics.  (R 415-416).  The examination revealed negative straight leg raising and lumber discomfort when "lying down or getting up."  (R. 416).  Her lungs, heart, and abdomen all appeared normal and her hypertension was noted to be stable.  (Id.)  The Plaintiff was referred for gallstone surgery.  (Id.).

On September 1, 2011, Dr. Andrea Pollack, an internist, conducted a consultative examination of the Plaintiff.  (R. 264–68.)  In a report of the examination, Dr. Pollack stated:

> The claimant appeared to be in no acute distress.  Gait normal.  Can walk on heels and toes without difficulty.  Squat was ¾ of the way down.  Stance normal.  Used no assistive devices.  Needed no help changing for exam or getting on and off exam table.  Able to rise from chair without difficulty.

(R. 266.)

Dr. Pollack further noted that the range of motion in the Plaintiff's "Lumbosacral spine" was slightly limited but that she "report[ed] no back pain."  (R. 267.)  He diagnosed the Plaintiff with the following conditions: (1) hypertension; (2) mitral valve prolapse; (3) chest tightness; (4) asthma; (5) anemia; (6) decreased visual acuity of the right eye; (7) migraines; (8) abdominal pain; and (9) gallstones.  (Id.)

Dr. Pollack concluded:

On the basis of my evaluation, she should avoid heights, operating heavy machinery, activities which require heavy exertion. She should avoid smoke, dust, and known respiratory irritants. She has a moderate restriction in lifting, carrying, bending, pushing, and pulling. She is restricted in activities which require fine visual acuity of the right eye.

(R. 267.)

On September 12, 2011, the Plaintiff had an appointment with Long Island Surgery. (R. 413.) At the appointment, she indicated that she had recently experienced "sharp and constant" abdominal pain. (Id.) The Plaintiff was advised to obtain an abdominal ultrasound and to see a gastroenterologist for an endoscopy. (Id.)

On September 20, 2011, Dr. Kathleen Acer, PH.D., a psychologist at Industrial Medicine Associates, P.C., performed a consultative psychological exam of the Plaintiff. (R. 273–76.) During the examination, Dr. Acer described the Plaintiff's functioning as follows:

She does report significant manic episodes on a daily basis. She has racing thoughts, flights of ideas, and a high degree of paranoia, believing that people are staring at her and talking about her. She is . . . agitated and distractible. She has rapid and pressured, mood swings, and anxiety. She feels jittery nervous, and tense all the time and shaky frequently. She does have depressive episodes at times, isolating, withdrawn, fatigue, and lack of energy and motivation[.]

(R. 273–74.)

Dr. Acer made the following observations of the Plaintiff during the evaluation: (i) she was "cooperative" and presented an "appropriate and well-groomed manner"; (ii) she was "agitated," "anxious,' and "tense"; (iii) her speech was "fluent" but her thought processes were "irrelevant and scattered"; (iv) her memory skills and her attention appeared "mildly impaired"; (v) she could "count and do simple calculations"; (vi) her intellectual skills are average; and (vii) her insight and judgment were "fair." (R. 274–75.)

Dr. Acer described the Plaintiff's "mode of living" as follows:

She can dress, bathe, groom herself. She does limited cooking and cleaning due to physical issues. She goes shopping in small shops only because she becomes overwhelmed and anxious. She can manage finances. She does not drive. She avoids taking public transportation.

(R. 275.)

Ultimately, Dr. Acer concluded:

With regard to vocational capacities, [the Plaintiff] can follow and understand simple instructions and directions and perform simple tasks, but would have difficulty maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, adequately relating with others, and dealing with stress. The results of the evaluation appear to be consistent with psychiatric issues and substance abuse issues, which interfere with her functioning.

(Id.)

On September 21, 2011, Zeoli, a nurse practitioner at Seafield, completed a psychiatric evaluation form. (R. 341-348). Mr. Zeoli noted that the plaintiff was casually and appropriately dressed. (Id.) He also recorded that she was cooperative, her behavior was appropriate, her speech was within normal limits, her thought processes were logical, and her mood was "down." (R. 343.) He recommended that her medication be adjusted and that she continue follow her treatment program. (R. 344.)

In the September 21, 2011 report, Zeoli noted that the Plaintiff's Global Assessment of Functioning ("GAF") score had previously been 50, and he increased that score to 52. (Id.) By way of background, "[t]he GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms." Kohler v. Astrue, 546 F.3d 260, 262 n. 1 (2d Cir.2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000)). A score of 41–50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning

(e.g., no friends, unable to keep a job)." Parker v. Comm'r of Soc. Sec. Admin., No. 2:10-CV-195, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011) (quoting DSM-IV, at 32). A score of "51–60" indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)." Id. (citation omitted). Thus, the Plaintiff's GAF score of 52 indicated that she was experiencing moderate symptoms due to her mental health conditions.

On September 29, 2011, Dr. Thomas P. Ribaudo, a cardiologist, reviewed an electrocardiogram of the Plaintiff's heart. (R. 349-351). The Plaintiff reported symptoms of "chest discomfort and shortness of breath." (R. 350.) Dr. Ribuado determined that her symptoms were due to "ischemic heart disease" and her history of cigarette smoking. (Id.) He recommended that the Plaintiff undergo a stress test and attend a smoking cessation and weight management program. (Id.) The Plaintiff refused to accept the referral to the smoking cessation and weight management programs. (Id.)

On October 11, 2011, Dr. Ribuado performed an echocardiographic study on the Plaintiff, which revealed "mild-to-moderate" abnormalities. (R. 357-358).

On October 13, 2011, Dr. G. Kleinerman, a state agency review psychiatrist, filled out a "report of contact" form indicating that he spoke on the telephone with Zeoli, a nurse practitioner at Seafield who had been treating the Plaintiff. (R. 170.) According to Dr. Kleinerman's notes, the Plaintiff had complained to Zeoli during their September 22, 2011 visit of feeling paranoid, anxious, and dysphoric. (Id.) However, Zeoli "did not find signs of psychosis. She was not suicidal/homicidal. Her productions were coherent/goal directed. She was able to attend and was not distracted." (Id.)

On October 14, 2011, Dr. Gary Bernstein, M.D., a gastroenterologist, evaluated the Plaintiff. (R. 361-364.) She complained of "upper abdominal pain sometimes associated with nausea, vomiting, diarrhea, and constipation." (R. 361.) A physical exam did not reveal any abnormalities. (R. 362–63.) Dr. Bernstein recommended the Plaintiff undergo a colonoscopy to rule out other conditions, such as colorectal cancer, and prescribed Omeprazole. (R. 363.)

On October 17, 2011, the Plaintiff underwent a stress test performed by Dr. Michael Casa, at North Suffolk Cardiology. (R. 352-356). According to his report, the "stress images" revealed no abnormalities in the Plaintiff's heart. (R. 352.)

The same day, on October 17, 2011, Dr. Kleinerman, the state review psychiatrist, spoke with Kevin Bryant, the Plaintiff's substance abuse counselor at Seafield. (R. 171). Bryant reported that:

> [The Plaintiff] travels independently to the substance abuse meetings and is keeping all her appointments responsibly . . . Clinically, she is alert, cooperative. Dress/grooming are appropriate/good. Her participation in the meetings is active/attentive, and she even surprises herself at some of the material she is able to share with the other members.

(Id.)

Also, on October 17, 2011, Dr. Kleinerman completed a residual function capacity assessment of the Plaintiff's mental health. (R. 300–02.) Dr. Kleinerman based his assessment on "Psych CE, data drom PNP and [her] [s]ubstance abuse counselor." (R. 302.) Based on his review of these sources, he concluded that:

> No evidence of delusional ideation/hallucination, paranoid trends present; treating sources report coherent/goal directed thought; despite liability of affective display (CE) concentration/memory functions deemed to be only mildly impaired . . . . [She is] able to perform household chores . . . ; claimant reports 'limited' socialization (note: manages well at group therapy sessions) . . . . [The] Claimant retains the capacities for remembering, understanding and carrying out non-complex instructions, for relating appropriately under conditions of reduced

interpersonal [contact] at the least, and for exercising judgment appropriately in
the workplace.

(R. 302.)

On November 30, 2011, the Plaintiff was evaluated by Dr. Paul Kubiak, an orthopedic

surgeon, because she was complaining of "low back pain," which she claimed to have

experienced for "a couple of years."  (R. 374.)  Dr. Kubiak performed a physical exam and noted

that the Plaintiff was "in moderate distress" and showed "significant limitations on flexion and

extension through the lumbosacral spine."  (Id.)  However, he noted that "she ambulates without

the need for any assisted device."  (Id.)  He also performed X-rays on the Plaintiff's spine, which

showed "some mild disc space narrowing . . . but overall well maintained boney alignment and

no obvious fractures noted."  (Id. at 375.)  He referred the Plaintiff to physical therapy and a pain

management specialist.  (Id.)

The Plaintiff attended follow-up appointments with Dr. Kubiak on December 7, 2011 and

January 4, 2012.  (R. 372–73.)  At these appointments, Dr. Kubiak noted "moderate" tenderness

in her lower back and limits to her range of motion but otherwise found the Plaintiff to be in

normal health.  (Id.)

On March 22, 2012, Patricia Hodge ("Hodge"), a psychiatric nurse practitioner at

Farmingville Mental Health Clinic ("Farmingville"), performed an initial psychiatric evaluation

of the Plaintiff.  (R. 314–322.)  Hodge summarized her mental status evaluation of the Plaintiff

as follows:

> [The Plaintiff] is alert and oriented to time, place, person and situation. She is sad
> and anxious with congruent effect.  Her eye contact is good.  She is adequately,
> casually attired.  Her speech is clear, relevant, coherent, and goal directed.  She is
> attentive and cooperative but mildly guarded.  She has memory deficits for long
> term events.  She has insight, past judgment is poor.  She is not considered a
> danger to herself or others.

(R. 317.)

From June 28, 2012 to August 29, 2012, the Plaintiff was seen on nine occasions by Christine Tigar ("Tigar"), a social worker at Farmingville. Tigar's notes from the meetings indicate that the Plaintiff was doing well but had occasional episodes of increased anxiety.

For example, during an August 1, 2012 visit, Tigar noted that the Plaintiff was "beaming with joy because she and her [boyfriend] were able to find a tiny house in Sound Beach that they can afford . . . . She is applying for SSD [social security disability] and hopes to be able to get a car after this is all over." (R. 489.) In an August 15, 2012 session, Tigar noted that the Plaintiff appeared to be "calmer," hopeful," and reported that "she is no longer getting migraines . . . because of the addition of Topomax." (R. 491.) During an August 29, 2012 session, Tigar noted that the Plaintiff "has been afraid to go anywhere lately . . . . She is doing well so I suspect that her success is scaring her." (R. 493.)

On September 7, 2012, Dr. Glenn Gray, a neuro radiologist, reviewed an MRI of the Plaintiff's cervical spine. (R. 483–84.) He noted "degenerative changes, particularly at C5/6, where there is [a] right-sided herniation resulting in right-sided cord flattening and moderate to marked right foraminal compromise. There are degenerative changes at C6/7 and C4/5[.] Straightening of the cervical lordosis with convexity toward the left." (R. 484.)

Finally, on September 26, 2012, Brian Yonks, the Plaintiff's chiropractor, performed a medical assessment on the Plaintiff's ability to do work based on treating her on four occasions. (R. 514-16). He determined that due to the Plaintiff's issues with her lower back, she could lift and carry greater than fifteen pounds on a very limited basis throughout the eight hour workday and that she could only sit or stand without interruption for a two hour period. (R. 515).

## C. Procedural History

On June 20, 2011, the Plaintiff filed an application with the SSA seeking supplemental social security income.  In her application, she alleged that she had been disabled since April 2, 2008 due to the following conditions:  "deteriorating discs, diabetes, bipolar disorder, anemia, heart problems, anxiety, asthma, migraines, strabismus, hypertension, and mitral valve prolapse." (R. 131, 135.).

On October 19, 2011, the SSA denied the Plaintiff's claim.  On November 22, 2011, the Plaintiff filed a written request for a hearing before an administrative law judge ("ALJ").  ALJ April M. Wexler was assigned to the case.

### 1. The September 28, 2012 Hearing

On September 28, 2012, ALJ Wexler held a hearing in which the Plaintiff and Rocco Meola ("Meola"), an impartial vocational expert, testified.

### a. The Testimony by the Plaintiff

When asked what she believed prevented her from working, the Plaintiff testified that she could not work because of the "bad disc" in her lower back and upper back, and because she suffered from "depression, bipolar, and anxiety."  (R. 40.)

With respect to her alleged back issues, the Plaintiff testified that she goes to physical therapy four times a week and it "help[ed] a little bit."  (R. 41.)  She testified that she has the ability to walk around her neighborhood; she feels a "sharp pain" when she bends down; and she did not know if she could carry a gallon of milk.  (R. 47.)

With regard to the Plaintiff's alleged mental state, she testified that on four to five days a week, she does not want to leave her house and will spend the majority of her day watching television on her couch.  (R. 43.)  On the two days a week that she feels well enough to leave her

house, the Plaintiff stated that she would occasionally walk around her neighborhood; cook dinner; clean her house; and go to the supermarket with her husband. (R. 44–46.)

She testified that she sometimes had problems remembering people's names, her appointments, or what happened a few days ago. (R. 48.) She stated that she suffers from "very bad anxiety" when she leaves the house and is in large groups. (R. 49–50.) When asked if she would be able to work in a job where she was not interacting with many people and had to answer the phone from "time to time," the Plaintiff responded, "I don't know. And like if the phone started ringing, you know, crazy[,] I would start to get like nervous and anxiety, and like agitated." (R. 51.)

### b. The Testimony by the Vocational Expert

ALJ Wexler asked Meola, the impartial vocational expert, whether an individual with the following hypothetical characteristics could perform the Plaintiff's prior work as a cashier or house cleaner: (i) an individual of the Plaintiff's age and education; (ii) the individual is limited to "light work" and "occasionally lift[ing] 20 pounds, frequently lift[ing] 10 pounds"; (iii) the individual is limited to sitting or walking for six hours in an eight hour day; (iv) the individual "would occasionally climb ramps or stairs . . . , balance, stoop, kneel, crouch and crawl"; (v) the individual would be limited to "routine tasks involving no more than simple one and two step instructions, simple work-related decisions with few workplace changes that are low stress jobs"; (vi) the individual would avoid concentrated exposure to "fumes, odors, dust, gases, poor ventilation, hazards"; and (vii) the individual's interaction with "supervisors, co-workers and members of the public" would be limited.

Meola responded that "[w]ith the limitations of that hypothetical, [the Plaintiff] could not do her past relevant work." (R. 54.) ALJ Wexler asked Meola if "[t]here are any other jobs in

the local or national economy that such a hypothetical individual could perform." (Id.) Meola

testified that "[w]ith those limitations[,] the types of job that one may be able to perform would

be . . . as a ticketer, . . . [a] microfilm mounter, [or a] . . . sealing machine operator." (R. 55.)

Meola further testified that 5,000 such jobs existed in the New York, Long Island, and New

Jersey area, and 80,000 existed nationally. (Id.)

ALJ Wexler asked Meola if the same hypothetical individual could still perform any of

the jobs he described if the individual needed to be absent from work three to four days per

month. (Id.) Meola responded, "If it happens at that frequency, . . . the person would not able to

do the jobs as indicated, or any other job in the competitive labor market." (Id.)

### 2. The Relevant Analytical Framework

Before addressing the decision by ALJ Wexler to deny the Plaintiff's application for SSI,

the Court finds it necessary to provide a brief overview of the framework for determining

whether an individual is eligible for such benefits under the Act.

A claimant is entitled to SSI if they are (1) "disabled" within the meaning of the Act and

(2) meet certain income limits. 42 U.S.C. § 1382(a).

42 U.S.C. § 1382c(3)(A), in turn, defines "disability" as when an individual is "unable to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months."

In addition, his "physical or mental impairment or impairments" must be of such severity

that he "is not only unable to do his previous work but cannot, considering his age, education,

and work experience, engage in any other kind of substantial gainful work which exists in the

national economy[.]" 42 U.S.C.A. § 1382c(3)(B) (West)

The SSA regulations set forth a five-step sequential evaluation process for determining whether a claimant meets the definition of "disability." 20 C.F.R. § 416.920. The Second Circuit has implemented that procedure as follows:

> (1) "the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity";
> (2) "[i]f he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities";
> (3) "[i]f the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience";
> (4) "[a]ssuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work"; and
> (5) "[f]inally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); see also Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (same); Gonzalez v. Colvin, No. 14-CV-06206 (SN), 2015 WL 1514972, at *14 (S.D.N.Y. Apr. 1, 2015) (same).

A claimant bears the burden of proof as to the first four steps of the sequential evaluation, but "'if the claimant shows that [her] impairment renders [her] unable to perform [her] past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.'" Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) (quoting Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983)); see also Larocque v. Colvin, No. 8:13-CV-547 (MAD), 2015 WL 1482627, at *2 (N.D.N.Y. Mar. 31, 2015) (same).

### 3. The Decision by ALJ Wexler

On October 17, 2012, ALJ Wexler issued a written decision finding that the Plaintiff was not "disabled" under the Act and therefore, was not entitled to SSI benefits. (R. 14-32).

In that regard, ALJ Wexler found that the Plaintiff had met the first two steps of the five step sequential analysis described above — namely, that the Plaintiff had (i) not engaged in substantial gainful activity since June 20, 2011, when she filed her application with the SSA; and (ii) the Plaintiff's diagnoses of cervical and lumbar degenerative disc disease, asthma, depression, bipolar and anxiety disorders constituted "severe impairments." (R. 19).

With respect to the third step — whether the claimant has an impairment listed in Appendix 1 of the Regulations which renders the Plaintiff disabled without having to address her "vocational factors" — she found that the Plaintiff's alleged mental and physical impairments did not meet the severity of one of the listed impairments in Appendix 1. See 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

Proceeding to the fourth step — whether despite the impairment, the claimant has the residual functional capacity to perform her past work —, ALJ Wexler examined the testimony of the Plaintiff, the medical records from the Plaintiff's treating physicians, and the medical records from the consultative physicians. Based on this evidence she determined that the medical records showed that the claimant had suffered from "medically determinable 'severe' impairments." (R. 25–26.) However, she found that the medical records did not corroborate the claim by the Plaintiff that she was "totally disabled." (Id.) In that regard, ALJ Wexler placed particular weight on the notes of Tigar, her counselor at Farmingville, indicating that the Plaintiff "was doing well under the current regime," together with the Plaintiff's own testimony that when she is feeling better she can clean, dress, cook dinner, and walk around. (R. 24.) Thus, although

ALJ Wexler did not discount all of the Plaintiff's testimony, she found the Plaintiff's testimony

that she was totally disabled and was unable to leave her house for four to five days a week to be

not credible. (R. 24–25.)

In addition, ALJ Wexler noted that a September 20, 2011 psychiatric evaluation

performed by Dr. Acer, one of the Plaintiff's treating psychologists, stated that the Plaintiff

"would have difficulty maintaining attention and concentration, maintain a regular schedule,

learning new tasks, performing complex tasks independently, adequately relating with others,

and dealing with stress." However, ALJ Wexler only accorded the opinion by Dr. Acer "some

weight" because she did not take into consideration the medical records from the Plaintiff's

recent treatment at Farmingville, which "demonstrate [the Plaintiff's] improvement with

treatment and repeatedly note [that] the claimant is doing well." (R. 24.)

Based on the Plaintiff's credible testimony and her medical records, ALJ Wexler found

that the Plaintiff could perform some "light work" as defined in 20 C.FR 416.967(b).

"Light work" is defined by 20 CFR 416.967(b) as:

Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds. Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls. To be considered capable of performing a full or
wide range of light work, you must have the ability to do substantially all of these
activities.

However, ALJ Wexler found that in light of her mental and physical impairments, the Plaintiff

could not perform all "light work" as specified by 20 CFR 416.967(b). (R. 20, 25.) Rather, she

could only perform "light work" that was "limited to simple routine tasks involving . . . one or

two step instructions" and where the Plaintiff will only be required to have "occasional contact

with supervisors, co-workers, and members of the public." Due to her physical limitations, the

work must also give the Plaintiff the "ability to change positions from sitting to standing at will." (Id.)  Based on these limitations, ALJ Wexler determined that the Plaintiff did not have the residual functional capacity to perform her prior work as a cashier or a house cleaner.  (R. 25.)

At step five of the analysis — whether there is other work in the national economy that the Plaintiff can perform — ALJ Wexler relied on the testimony of Meola, a vocational expert, who testified that despite her limitations, the Plaintiff could perform work as a "ticketer," "microfilm mounter,' or "sealing machine operator."  (R. 26.)  Based on this testimony, she found that the Plaintiff was "capable of making successful adjustment to other work that exists in significant numbers in the national economy."  (Id.)  As such, she found the Plaintiff to be not disabled under the Act, and therefore, not entitled to SSI benefits.

### 4. The Present Action

On November 14, 2012, the Plaintiff filed an appeal to the SSA Appeals Council.  (R. 10–16.)  On July 25, 2013, the Appeals Council denied the Plaintiff's request for further review. (R. 1-3.).

On September 18, 2014, the Plaintiff commenced this action pursuant to 42 U.S.C. §405(g) seeking and Order from this court: (i) reversing the final determination by the SSA Appeals Council denying the Plaintiff's application for social security disability benefits; (ii) finding that the Plaintiff is entitled to disability benefits; (3) remanding the case to the SSA for further administrative proceedings based on the alleged legal and factual errors committed by ALJ Wexler; and (4) awarding attorneys' fees.

Presently before the Court is a (i) motion by the Plaintiff pursuant to Fed. R. Civ. P. 12(c) for a judgment on the pleadings in favor of the Plaintiff; and (ii) a cross-motion by the Defendant

pursuant to Fed. R. Civ. P. 12(c) for a judgment on the pleadings dismissing the Plaintiff's

appeal in its entirety.

## II. DISCUSSION

### A. Legal Standards

"A district court may set aside the Commissioner's determination that a claimant is not

disabled only if the factual findings are not supported by 'substantial evidence' or if the decision

is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v.

Chater, 221 F.3d 126, 131 (2d Cir. 2000)).

Thus, judicial review of the Commissioner's final decision requires "two levels of

inquiry." Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).  The district court "first reviews

the Commissioner's decision to determine whether the Commissioner applied the correct legal

standard." Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see also Arzu v. Colvin, No. 14

CIV. 2260 JCF, 2015 WL 1475136, at *8 (S.D.N.Y. Apr. 1, 2015) ("First, the court must decide

whether the Commissioner applied the correct legal standard.") (citing Apfel, 167 F.3d at 773;

see also Calvello v. Barnhart, No. 05 CIV. 4254 (MDF), 2008 WL 4452359, at *8 (S.D.N.Y.

Apr. 29, 2008), report and recommendation adopted, No. 05 CIV 4254 SCR MDF, 2008 WL

4449357 (S.D.N.Y. Oct. 1, 2008) (same).

Next, the Court examines the administrative record to "determine if there is substantial

evidence, considering the record as a whole, to support the Commissioner's decision[.]"

Burgess, 537 F.3d at 128 (quoting Shaw, 221 F.3d at 131).  "Substantial evidence means

'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" Id. (quoting Halloran v. Barnhart, 362 F.3d 28, 31 (2d

Cir. 2004)).  However, the Court may not properly "affirm an administrative action on grounds

different from those considered by the agency." <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999).

"[Substantial evidence] is still a very deferential standard of review—even more so than the 'clearly erroneous' standard." <u>Brault v. Soc. Sec. Admin.</u>, Com'r, 683 F.3d 443, 448 (2d Cir. 2012). For example. "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits us to glean the rationale of an ALJ's decision.'" <u>Cichocki v. Astrue</u>, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1040 (2d Cir. 1983)). Moreover, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (quoting <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982)).

## B. As to Whether Substantial Evidence Supports the Decision by ALJ Wexler

As noted above, ALJ Wexler found that: (i) the Plaintiff had not engaged in substantial gainful activity since June 20, 2011; (ii) the Plaintiff had diagnosed conditions, "cervical and lumbar degenerative disc disease, asthma, depression, [and] Bipolar and Anxiety Disorders," which were severe; (iii) the Plaintiff's impairments did not equal the severity of the impairments in Appendix 1 of the SSA regulations, which result in a *per se* finding of disability; (iv) the Plaintiff had the residual functional capacity to perform light work, with some additional limitations; (v) the Plaintiff did not have the residual capacity to perform her prior work as a cashier or a house cleaner; and (vi) the Plaintiff had the residual capacity to perform jobs that exist in significant numbers in the national economy.

When reviewing the decision by the ALJ to deny benefits under the Act, the Court must (i) determine whether the ALJ applied the correct legal standard; and (ii) considering the record

as a whole, determine if there is substantial evidence to support the Commissioner's decision. Tejada, 167 F.3d at 773.

With respect to the first issue, the Plaintiff does not assert that ALJ Wexler applied an incorrect legal standard to her claim. Moreover, the Court finds that she applied the correct five step test set forth in the SSA regulations to determine whether she was disabled. (R. 10–11.) Accordingly, the Court need not address the first issue.

With regard to the second issue, as set forth below, the Court finds the decision by ALJ Wexler to be supported by substantial evidence in the medical records.

**1. Steps One to Three of the Disability Analysis**

As noted, at steps one to three of the disability analysis, ALJ Wexler determined that: (i) the Plaintiff had not engaged in substantial gainful activity since June 20, 2011; (ii) the Plaintiff had severe impairments; and (iii) the Plaintiff's impairments did not equal the severity of the impairments in Appendix 1 of the SSA regulations, which result in a *per se* finding of disability.

The Defendant argues that there is substantial evidence to support the findings by ALJ Wexler at the first three steps. The Plaintiff does not appear to dispute the findings with respect to the first three steps.

The Court notes that SSA regulations require that when a claimant alleges disability due to mental impairments, the ALJ must apply "special technique" at the second and third steps of the five-step framework. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). This technique requires the reviewing authority to "first determine whether the claimant has a 'medically determinable mental impairment.'" Id. (quoting § 404.1520a(b)(1)).

"If the claimant is found to have such an impairment, the reviewing authority must: (1) 'rate the degree of functional limitation resulting from the impairment(s) in accordance with

paragraph (c)," § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation."' Id. (quoting 20 C.F.R. § 404.1520a(c)(3)).

According to the regulations, "if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Id. (citing 20 C.F.R. § 404.1520a(d)(1).

If the claimant's mental impairment is severe, "the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Id. (quoting 20 C.F.R. 404.1520a(d)(2)).

If the reviewing authority finds that the claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, [it] will then assess your residual functional capacity." Id. (quoting 20 C.F.R. 404.1520a(d)(3)).

Here, ALJ Wexler applied the "special technique" required by SSA regulations in determining whether the Plaintiff's diagnosed mental conditions — depression, bipolar disorder, and anxiety disorder — constitute severe mental impairments. Given that her mental conditions caused "more than minimal conditions," she found that the Plaintiff's mental conditions were severe. (R. 19.) However, she found that the Plaintiff's mental conditions do not cause "more than moderate restrictions in performing activities of daily living, in social functioning, and with concentration, persistence of pace." (R. 20.) As such, she did not find the conditions to be *per se* disabling and proceeded to the fourth and fifth steps to determine whether the Plaintiff had the residual functional capacity to perform her prior work or any other work. (Id.)

As noted, the Plaintiff does not dispute that ALJ Wexler properly applied the "special technique" required by the SSA regulations in determining whether a mental condition is severe and *per se* disabling. Nor does she dispute that ALJ Wexler's decision at this step was supported by the substantial evidence.

In addition, as is made clear below, the Court finds that the determination by ALJ Wexler that the Plaintiff's mental and physical conditions only caused moderate restrictions on the Plaintiff's daily living is supported by the substantial evidence.

Thus, the Court does not find error in the findings of ALJ Wexler with respect to the first three steps of the disability analysis.

**2. Step Four of the Disability Analysis**

**a. The Plaintiff's Physical Impairments**

As noted above, the SSA regulations define "light work" as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Further, a job "is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id.

The Defendant asserts that substantial evidence supports the decision by ALJ Wexler that the Plaintiff can perform "light work" despite her physical impairments, "cervical and lumbar degenerative disc disease and asthma." (The Def.'s Mem. of Law 26–32.) The Plaintiff focuses its argument entirely on the Plaintiff's mental conditions and does not appear to dispute the decision by ALJ Wexler with respect to the Plaintiff's physical limitations.

The Court finds that the determination by ALJ Wexler that the Plaintiff's lower back condition and asthma do not preclude her from performing "light work" is supported by the

substantial evidence. There are no medical records indicating that the Plaintiff's asthma precludes her from physically exerting herself. Even if there were, ALJ Wexler specifically accounted for her alleged limitations by noting that the Plaintiff has the capacity to perform "light work" so long as it does not involve "concentrated exposure to fumes, odors, dusts, gases poor ventilation[.]" (R. 20.)

With regard to her back condition, the medical reports by Dr. Kubiak, her treating orthopedic surgeon who examined the Plaintiff on four occasions from November 30, 2011 to February 1, 2012, indicate that the Plaintiff had moderate physical limitations due to her back condition. (R. 371–75.) For example, on November 30, 2011, Dr. Kubiak stated that X-Rays of the Plaintiff's spine showed "some mild disc space narrowing between L4 and L5 veterbral bodies but overall well maintained boney alignment and no obvious fractures noted." (R. 375.) Similarly after reviewing an MRI of her spine on December 7, 2011, Dr. Kubiak wrote in his notes, "Nothing that I would recommend any urgent surgeries for. I'd like to see how she progresses with the therapy and pain management treatments." (R. 371.)

The Plaintiff attended physical therapy from December 2, 2011 to March 9, 2012 at Island Musculoskeletal Care. (R. 376–389.) The records from her visits indicate that her back condition responded well to the treatment. (R. 380.) For example, the progress notes from her last visit on March 9, 2012 state that the Plaintiff "tolerated treatment activities well without increased pain or symptoms. [She] is demonstrating good comprehension/verbalization of treatment activities." (Id.)

Similarly, on September 7, 2012, Dr. Glenn Gray, a neuro radiologist, reviewed an MRI of the Plaintiff's cervical spine and noted "degenerative changes, particularly at C5/6, where there is [a] right-sided herniation resulting in right-sided cord flattening and moderate to marked

right foraminal compromise."  However, nothing in the medical records suggests that these "degenerative changes" precluded the Plaintiff from performing "light work."

Indeed, the testimony of the Plaintiff herself tends to suggest that she is only mildly limited by her back condition.  She testified that she sometimes feels a "sharp pain" in her back when she bends down and has trouble sitting or standing for long periods.  (R. 47.)  However, she also testified that when she is feeling mentally up to it, she is able to walk at least a block, go shopping, cook, dress herself, and independently get to her physical therapy and substance abuse treatment appointments. (R. 44–47.)  Thus, by her own admission, she is physically capable of performing everyday tasks.

In sum, the medical records and the Plaintiff's own testimony all support the finding by ALJ Wexler that the Plaintiff can perform "light work" despite the documented issues with her back and asthma.  See, e.g., Mancuso v. Astrue, 361 F. App'x 176, 178-79 (2d Cir. 2010) (Summary Order) ("The ALJ accepted Mancuso's pain as a factor limiting her abilities and precluding heavy work. Nevertheless, his determination that the pain was not sufficient to preclude light work was supported by the objective medical evidence and by the reports of Dr. Amelita Balagtas and Dr. Goodman."); Campbell v. Astrue, No. 12-CV-5051 (ADS), 2015 WL 1650942, at *12 (E.D.N.Y. Apr. 13, 2015) (Spatt, J) (finding that substantial evidence supported a finding by the ALJ that the plaintiff could perform "light work" because the Court found "ample evidence in the record demonstrating the Plaintiff's treating physicians consistently described her as being, at most, moderately physically limited despite her injuries."); Turner v. Comm'r of Soc. Sec., No. 12-CV-02259 (CBA), 2014 WL 1310313, at *10 (E.D.N.Y. Mar. 31, 2014) ("[B]ecause neither of Turner's treating doctors suggested that his back problems limited

his movement or interfered with his ability to function, the ALJ's conclusion that Turner could engage in light work activity was entirely consistent with the opinions of those physicians.").

### b. The Plaintiff's Mental Impairments

With regard to the Plaintiff's mental impairments, ALJ Wexler noted that Dr. Acer, a psychologist who performed a consultative examination of the Plaintiff, opined that the Plaintiff was somewhat limited due to her mental conditions. (R. 24.) Dr. Acer concluded that:

> [T]he Plaintiff can follow and understand simple instructions and directions and perform simple tasks, but would have difficulty maintaining attention and concentration, maintain a regular schedule, learning new tasks, performing complex tasks independently, adequately relating with others, and dealing with stress. The results of the evaluation appear to be consistent with psychiatric issues and substance abuse issues, which interfere with her functioning.

(R. 275.)

ALJ Wexler accorded Dr. Acer's opinion "some weight" but noted that it was somewhat inconsistent with the statements of the Plaintiff's treating psychological staff at Farmingville. (R. 24.) Accordingly, in light of the totality of medical evidence, ALJ Wexler concluded that the Plaintiff could perform "light work" so long as that work is limited to "simple routine tasks involving no more than simple, one or two step instructions and simple work related decisions with few work place changes, low stress jobs" and requires only "occasional contacts with supervisors, co-workers, and members of the public." (R. 21.)

The Court finds this determination to be supported by substantial medical evidence because the medical records of the Plaintiff's treating physicians suggest that the Plaintiff was able to perform basic activities associated with work. As ALJ Wexler correctly noted, Tigar, a social worker from Farmingville who treated the Plaintiff on nine occasions, stated that the Plaintiff was doing "well," avoiding alcohol and drugs, and focusing on future goals, such as moving out of a boarding house and into a home with her boyfriend. (R. 486.) In a June 29,

2012 session, Tigar noted that the Plaintiff was able to move with her boyfriend to a small home in Sound Beach and that her mood had improved markedly as a result: "Pamela is beaming with joy because she and her [boyfriend] were able to find a tiny house in Sound Beach . . . She is applying for [social security disability] and hopes to be able to get a car after this is all over." (R. 489.)

While the Plaintiff expressed anxiety in leaving her house on certain occasions, nothing in Tigar's notes suggest that the Plaintiff was unable to perform the basic functions required for performing "light work."

Other records from her treating medical staff corroborate Tigar's description of the Plaintiff's mood. For example, Hodge, a psychiatric nurse practitioner at Famingville who evaluated the Plaintiff on March 22, 2012 and September 17, 2012, described the Plaintiff's mood as "good" and noted that she was "doing well with current regime" and needed no change to her medications. (R. 495.)

Dr. Acer's opinion is also somewhat inconsistent with the opinion of Dr. Kleinerman, the state review psychiatrist, who evaluated the Plaintiff based on his conversations with the Plaintiff's substance abuse counselors at Seafield. (R. 171). He reported that:

> [The Plaintiff] travels independently to the substance abuse meetings and is keeping all her appointments responsibly . . . Clinically, she is alert, cooperative. Dress/grooming are appropriate/good. Her participation in the meetings is active/attentive, and she even surprises herself at some of the material she is able to share with the other members.

(Id.)

Accordingly, the Court finds that the determination by ALJ Wexler with regard to the Plaintiff's residual functional capacity to be entirely consistent with the record.

The Plaintiff argues that ALJ Wexler erred by not placing greater weight on Dr. Acer's opinion because she argues that the medical records from Farmingville "are not uniform or consistent in establishing that the Plaintiff's psychiatric condition(s) improved and that the Plaintiff was doing well."  The Court disagrees for two reasons.

First, under the SSA regulations, a "treating physician's opinion on the 'nature and severity' of the plaintiff's impairments will be given 'controlling weight' if the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record.'" Khan v. Astrue, No. 11-CV-5118 (MKB), 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013) (quoting 20 C.F.R. § 404.1527(c)(2)); see also Burgess, 537 F.3d at 128 ("[T]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]") (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).

However, the opinions of a consultative physician who performed a single exam on the claimant, like Dr. Acer, are not accorded any special weight and can be disregarded to the extent that they are not consistent with other medical evidence in the record.  See, e.g., Khan v. Astrue, No. 11-CV-5118 (MKB), 2013 WL 3938242, at *17 (E.D.N.Y. July 30, 2013) ("[T]he opinion of a treating psychotherapist cannot be given the same weight as the opinion of a consultative examiner."); Hernandez v. Astrue, 814 F. Supp. 2d 168, 182 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.'").  That is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." Anderson v.

Astrue, No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1992)).

Thus, ALJ Wexler did not commit legal error in disregarding portions of the Dr. Acer's opinion that were inconsistent with the opinions of the Plaintiff's treating medical staff at Seafield and Farmingville.

Second, there is no requirement, as the Plaintiff asserts, that the medical records be "uniform and consistent" in establishing the Plaintiff's ability to perform work. To the contrary, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

As noted above, the Court finds that there is substantial evidence to support the finding by ALJ Wexler that the Plaintiff's psychological conditions do not interfere with her ability to perform basic work functions. Thus, even if there is some contradictory medical evidence, as the Plaintiff contends, the Court is still required to affirm the decision by ALJ Wexler on this appeal. See Campbell, 2015 WL 1650942 at *15 ("Thus, the fact that there may be contradictory testimony in the record does not undermine the decision by ALJ Rayner on appeal."); Calzada v. Asture, 753 F. Supp. 2d 250, 268 (S.D.N.Y. 2010) ("It is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.").

The Plaintiff also contends that ALJ Wexler erred by not calling a medical expert to testify. (R. 24.) She alleges that because Dr. Acer had not reviewed the records by the Plaintiff's treating

medical staff at Farmingdale, it was incumbent upon ALJ Wexler to call a medical expert to allegedly fill in the gaps in the record.  Here again, the Court disagrees.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir.1996) (citing Echevarria v. Secretary of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)); see also Flagg v. Astrue, No. 5:11-CV-00458 LEK, 2012 WL 3886202, at *4 (N.D.N.Y. Sept. 6, 2012) (same).  In that regard, "[w]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.'" Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).

In addition, the Second Circuit has held that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record" by, for example, calling a medical expert. Burgess, 537 F.3d at 129 (emphasis added) (quoting Rosa, 168 F.3d at 79).

Here, the record contains substantial evidence from both treating and consultative sources indicating that the Plaintiff's cognitive abilities were only moderately impaired.  See Flagg, 2012 WL 3886202, at *5 ("The Court finds Plaintiff's argument unavailing because the record contains substantial evidence from both treating and consultative sources indicating that her cognitive and mental abilities were not significantly impaired. This is not a case in which a crucial issue of mental capacity is unexplored or left undeveloped.").  This is not a case where the Court "is unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision." Pratts v. Chater, 94 F.3d 34, 38 (2d Cir.1996) (citing Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir.1982)).

Further, Dr. Acer is a consultative physician, not a treating physician, and therefore, ALJ Wexler was not required to supplement the record with additional testimony before disregarding some portions of her opinion, as the Plaintiff contends. Thus, the Court finds the Plaintiff's contention that ALJ Wexler erred by not calling a medical expert to fill in the alleged gaps created by Dr. Acer's opinion to be without merit.

In sum, the Court finds that substantial evidence supports the finding by ALJ Wexler that the Plaintiff has the residual functional capacity to perform light work that (i) is "limited to simple routine tasks involving no more than simple, one or two step instructions and simple work related decisions"; (ii) does not require work at a "fixed production rate pace"; (iii) and requires "only occasional contact with supervisors, co-workers, and members of the public."

### c. The Credibility Determination by ALJ Wexler

The Second Circuit has made clear that "subjective assertions of pain *alone* cannot ground a finding of disability." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (emphasis in the original) (quoting 20 C.F.R. § 404.1529(a)); see also Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order) ("[W]hile an ALJ 'is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929,' he or she is 'not require[d] to accept the claimant's subjective complaints without question[.]'") (quoting Genier, 606 F.3d at 49).

Rather, an ALJ must follow a two-step process for evaluating a claimant's assertions of pain and other limitations. 20 C.F.R. § 404.1529(b)). "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Genier, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence' of record." Id. (quoting 20 C.F.R. § 404.1529(a)).

Here, the Plaintiff testified that due to her anxiety disorder, she had problems dealing with stress, being in large crowds, and was unable to leave her house four to five days a week. (R. 43, 49–51.)

The Court finds that ALJ Wexler followed the required process in evaluating the Plaintiff's credibility. As required by the regulations, she first found that the Plaintiff's symptoms of anxiety could be caused by her diagnosed mental conditions. However, she found that the "claimant's statements concerning the intensity, persistence and limiting effect" of her disorders to be not credible in light of the objective medical evidence. (R. 24.)

The Court finds that there is substantial evidence to support the conclusion by ALJ Wexler with regard to the Plaintiff's credibility. As noted above, although some of the medical records address the Plaintiff's fear of leaving her home, none of them indicate that her anxiety was acute enough to preclude her from leaving her home for four to five days a week. To the contrary, her treating medical staff at Seafield and Farmingville consistently noted that the Plaintiff had no problem getting dressed and independently making it to her medical appointments and treatments. She, herself, testified that she only misses her appointment "a couple times of month." (R. 48.)

Thus, the Court finds that the decision by ALJ Wexler with regard to the Plaintiff's credibility to be supported by substantial evidence.

### 3. As to the Fifth Step of the Disability Analysis

Where, as here, the ALJ determines that the Plaintiff cannot perform her prior work, the burden shifts to the Commissioner to "show there is other gainful work in the national economy

[which] the claimant could perform." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) as amended on reh'g in part, 416 F.3d 101 (2d Cir. 2005).

"In the ordinary case, the Commissioner meets his burden at the fifth step 'by resorting to the applicable medical vocational guidelines (the grids)' set forth in 20 C.F.R. § Pt. 404, Subpt. P, App. 2." Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (quoting Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir.1986)).

However, where, as here, "non-exertional impairments limit the range of work a claimant can perform the Commissioner must 'introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" Gladle v. Astrue, No. 7:12-CV-284 (NAM), 2013 WL 4543147, at *5 (N.D.N.Y. Aug. 27, 2013) (quoting Bapp, 802 F.2d at 603).

"When utilizing a vocational expert, administrative law judges pose hypothetical questions which must reflect the full extent of the claimant's capabilities and impairments to provide a sound basis for the vocation expert's testimony." Walker v. Colvin, No. 5:12-CV-483 GLS/ESH, 2013 WL 5434065, at *7 (N.D.N.Y. Sept. 27, 2013).

Of importance, "[w]hen a hypothetical question meets that requirement, and is supported by substantial evidence, expert vocational testimony suffices as substantial evidence supporting a Step 5 finding." Id.; see also Mancuso v. Astrue, 361 F. App'x 176, 179 (2d Cir. 2010) (summary order) ("[T]he ALJ's hypothetical mirrored Mancuso's RFC, which, as described supra Part.2c, was supported by substantial evidence in the record. The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence.").

In the present case, ALJ Wexler asked Meola, the impartial vocational expert, if an individual with the following hypothetical characteristics could perform any work in the national economy: (i) "an individual of the Plaintiff's age and education"; (ii) the individual is limited to "light work" and "occasionally lift[ing] 20 pounds, frequently lift[ing] 10 pounds"; (iii) the individual is limited to sitting or walking for six hours in an eight hour day; (iv) the individual "would occasionally climb ramps or stairs . . . , occasionally balance, stoop, kneel, crouch and crawl"; (v) the individual would be limited to "routine tasks involving no more than simple one and two step instructions, simple work-related decisions with few workplace changes that are low stress jobs"; (vi) the individual would avoid concentrated exposure to "fumes, odors, dust, gases, poor ventilation, hazards"; and (vii) the individual's interaction with "supervisors, co-workers and members of the public" would be limited. (R. 52–54.)

Meola testified that such a hypothetical individual could perform work as a "ticketer, . . . [a] microfilm mounter, [or a] . . . sealing machine operator" and that 5,000 such jobs existed in the New York, Long Island, and New Jersey area, and 80,000 existed nationally. (R. 55.)

The hypothetical characteristics in the question posed by ALJ Wexler to Meola were similar to the limits set forth in the residual functional capacity assessment. Further, as noted above, the residual functional capacity assessment by ALJ Wexler is supported by substantial evidence in the record. Accordingly, the Court finds that the ALJ properly relied on the testimony of Meola in establishing that the Plaintiff could perform work as a "ticketer, . . . [a] microfilm mounter, [or a] . . . sealing machine operator." See Walker, 2013 WL 5434065, at 12 ("The hypothetical question posed to the expert exactly matched Walker's residual functional capacity as determined by ALJ Peffley . . . . That residual functional capacity rating and other

factors posed to the expert are supported by substantial evidence. Therefore, ALJ Peffley's use of and reliance on expert vocational testimony was appropriate.").

Therefore, the Court finds that the determination by ALJ Wexler that the Plaintiff could perform work as a "ticketer," "microfilm mounter," or "sealing machine operator" to be supported by the substantial evidence. Accordingly, the Court affirms the decision by ALJ Wexler finding that the Plaintiff is not "disabled" within the meaning of the Act and thus does not qualify for SSI benefits.

### III. CONCLUSION

Based on the foregoing reasons, it is hereby:

**ORDERED**, that the decision by ALJ Wexler is affirmed; and it is further

**ORDERED**, that the Defendant's motion for a judgment on the pleadings dismissing the complaint is granted; and it is further

**ORDERED**, that the Plaintiff's motion for a judgment on the pleadings is denied; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
August 14, 2015

_/s/ Arthur D. Spatt____
ARTHUR D. SPATT
United States District Judge